[L.A. No. 30271. In Bank. Aug. 21, 1974.]

MARY ANNE RODRIGUEZ, Plaintiff and Appellant, v.
BETHLEHEM STEEL CORPORATION et al.,
Defendants and Respondents.

## COUNSEL

Ned Good for Plaintiff and Appellant.

Robert E. Cartwright, Edward I. Pollock, William H. Lally, Stephen I. Zetterberg, Robert G. Beloud, David B. Baum and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

Lillick, McHose, Wheat, Adams & Charles, Gordon K. Wright, Kenneth R. Chiate, Schell & Delamer, Martin A. Yester, Ralph D. Kirwan, Waters, McCluskey & Corcoran, Laurence R. Corcoran, Gerald E. McCluskey and Lester W. Miller for Defendants and Respondents.

## OPINION

**MOSK, J.**—In this case we are called upon to decide whether California should continue to adhere to the rule that a married person whose spouse has been injured by the negligence of a third party has no cause of action for loss of "consortium," i.e., for loss of conjugal fellowship and sexual relations. (*Deshotel* v. *Atchison, T. & S. F. Ry. Co.* (1958) 50 Cal.2d 664 [328 P.2d 449]; *West* v. *City of San Diego* (1960) 54 Cal.2d 469, 475-478 [6 Cal.Rptr. 289, 353 P.2d 929].) As will appear, we have concluded that the reasons for this rule have ceased and that California should join the large and growing majority of jurisdictions which now recognize such a cause of action.

The case is here on an appeal from a judgment of dismissal entered upon the sustaining of general demurrers without leave to amend. From the pleadings and supporting declarations filed by the parties, the following picture emerges.

On May 24, 1969, Richard and Mary Anne Rodriguez were married. Both were gainfully employed. In their leisure time they participated in a variety of social and recreational activities. They were saving for the time when they could buy their own home. They wanted children, and planned to raise a large family.

Only 16 months after their marriage, however, their young lives were shattered by a grave accident. While at work, Richard was struck on the head by a falling pipe weighing over 600 pounds. The blow caused severe

spinal cord damage which has left him totally paralyzed in both legs, totally paralyzed in his body below the mid-point of the chest, and partially paralyzed in one of his arms.

The effects of Richard's accident on Mary Anne's life have likewise been disastrous. It has transformed her husband from an active partner into a lifelong invalid, confined to home and bedridden for a great deal of the time. Because he needs assistance in virtually every activity of daily living, Mary Anne gave up her job and undertook his care on a 24-hour basis. Each night she must wake in order to turn him from side to side, so as to minimize the occurrence of bedsores. Every morning and evening she must help him wash, dress and undress, and get into and out of his wheelchair. She must help him into and out of the car when a visit to the doctor's office or hospital is required. Because he has lost all bladder and bowel control, she must assist him in the difficult and time-consuming processes of performing those bodily functions by artificial inducement. Many of these activities require her to lift or support his body weight, thus placing a repeated physical strain on her.

Nor is the psychological strain any less. Mary Anne's social and recreational life, evidently, has been severely restricted. She is a constant witness to her husband's pain, mental anguish, and frustration. Because he has lost all capacity for sexual intercourse, that aspect of married life is wholly denied to her: as she explains in her declaration, "To be deeply in love with each other and have no way of physically expressing this love is most difficult physically and mentally." For the same reason she is forever denied the opportunity to have children by him—she is, for all practical purposes, sterilized: again she explains, "I have lost what I consider is the fulfillment of my existence because my husband can't make me pregnant so as to bear children and have a family." The consequences to her are predictable: "These physical and emotional frustrations with no outlet have made me nervous, tense, depressed and have caused me to have trouble sleeping, eating and concentrating." In short, Mary Anne says, "Richard's life has been ruined by this accident. As his partner, my life has been ruined too."

At the time of the accident Richard was 22 years old and Mary Anne was 20. The injuries, apparently, are permanent.

To paraphrase our opening observation in *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 730 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], "That the courts should allow recovery" to a wife for losses she personally suffers by reason of negligent injury to her husband "would appear to be a compelling proposition." But the pathway to justice is not always smooth.

Here, as in *Dillon,* the obstacle is a prior decision of this court; and as in *Dillon,* the responsibility for removing that obstacle, if it should be done, rests squarely upon us.

The point was clearly made by the courts below. Richard and Mary Anne jointly filed an amended complaint against Richard's employer and various subcontractors. In the first cause of action, predicated on his own injuries, Richard prayed for substantial general damages, past and future medical expenses, and compensation for the loss of his earnings and earning capacity. In the second cause of action Mary Anne alleged the consequences to her of Richard's injuries, and prayed for general damages in her own right, the reasonable value of the nursing care she furnishes her husband, and compensation for the loss of her earnings and earning capacity. Defendants filed general demurrers to the second cause of action on the ground that no recovery for any such loss is permitted in California under the authority of *Deshotel* v. *Atchison T. & S. F. Ry. Co.* (1958) *supra,* 50 Cal.2d 664.

When the demurrers came on for hearing the trial court emphasized the rule, recognized in *Deshotel* (*id.* at p. 669), that in a wrongful death case a widow can recover damages for the loss of her deceased husband's society, comfort, and protection. The court criticized the contrary rule applicable when, as here, the husband is severely injured but does not die: "I have never been able to justify the law which permitted a widow to be compensated for the detriment suffered as a result of loss of companionship and so forth, but at the same time won't compensate her for the loss, together with the burden, of somebody made a vegetable as a result of something happening to her husband. I can't see it, but I feel kind of hide bound by the Appellate Court. That is my problem." Addressing Mary Anne's counsel, the court made it clear that it would have ruled in his client's favor but for the precedent of *Deshotel:* "I go along with you, counsel, on your philosophy of the law, as to what the law ought to be. What about the torque in me that is being created by the proposition that I have the expression of the courts on a higher level than this one that I feel duty bound to follow? [¶] You say I can blaze a trail. I don't think trial judges are entitled to blaze trails." On its own motion the court then severed Mary Anne's cause of action from that of Richard and sustained the general demurrers thereto without leave to amend, "In order to expedite the determination of the legal issues raised by defendants by a court of higher

level than this. . . ." Eventually a judgment of dismissal as to Mary Anne was entered (Code Civ. Proc., § 581, subd. 3), and she appealed.[1]

In affirming the judgment the Court of Appeal likewise indicated its dissatisfaction with the *Deshotel* rule, but correctly deferred to this court for any reconsideration of the doctrine: Presiding Justice Kaus, writing for a unanimous court, stated that "In spite of counsel's eloquent exhortations to the contrary, we must hold that it is up to the Supreme Court to qualify or overrule its decisions. We say this in full recognition of Mary Anne's argument that several Supreme Court cases since *Deshotel* and *West* can be read as undermining the rationale of those holdings." This is a perceptive and accurate reading of our decisions, as we shall explain.

To begin with, we delineate the rationale of *Deshotel* and *West*. Clearly it is not the original common law view, which held that a wife could not recover for loss of her husband's services by the act of a third party for the starkly simple reason that she had no independent legal existence of her own (1 Blackstone, Commentaries, p. *442) and hence had no right to such services in the first place.[2] That rationale was explicitly rejected in *West*, when the court declined to recognize the husband's common law right to recover for loss of his wife's consortium: "his right," we said, "was based upon the wife's subservient position in the marriage relationship whereas, under present-day law, spouses are generally regarded as equals." (54 Cal.2d at p. 477.)[3]

---

[1] As in *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 158, footnote 2 [95 Cal.Rptr. 623, 486 P.2d 151], the notice of appeal was premature and the judgment of dismissal was belated. For the reasons there stated, however, we treat both as timely.

[2] As the Iowa court neatly put it, "at common law the husband and wife were considered as one, and he was the one." (*Acuff* v. *Schmit* (1956) 248 Iowa 272 [78 N.W.2d 480, 484].)

[3] Prior to *Deshotel* and *West* the medieval view of the legal identity of husband and wife had been vigorously denounced in *Follansbee* v. *Benzenberg* (1954) 122 Cal.App.2d 466, 476 [265 P.2d 183, 42 A.L.R.2d 832]. Holding that a wife who pays for necessary medical services for her negligently injured husband can obtain reimbursement from the tortfeasor who caused the expense, the Court of Appeal reasoned: "The old common law rule that a wife had no right of action of this character obtained on the theory that the wife's personality merged in that of the husband's, that she had no right to hold property separate and apart from her husband, and had no right to sue in her own name. This hollow, debasing, and degrading philosophy, which has pervaded judicial thinking for years, has spent its course. These archaic notions no longer obtain. 'So prone are the courts to cling to consuetudinary law, even after the reason for the custom has ceased or become a mere memory, that it has required hundreds of years to obtain the meed of justice for married women.' (*Bernhardt* v. *Perry*, 276 Mo. 612 [208 S.W. 462, 470, 13 A.L.R. 1320].) The legal status of a wife has changed. Her legal personality is no longer merged in that of her husband. A husband has no longer any domination over the

In *Deshotel*, then, the original reason for the rule denying the wife recovery for loss of consortium had ceased, yet the rule itself did not cease (see Civ. Code, § 3510). Rather, the court devised new reasons of "policy and procedure" to justify the survival of the rule in California. A careful reading of the *Deshotel* opinion discloses seven distinct grounds of decision (at pp. 667-668 of 50 Cal.2d), which for convenience of discussion we shall group into three categories. We shall show that each of these reasons has been rendered untenable by developments subsequent to *Deshotel*.

*Stare decisis and the role of the Legislature.*

The principal reliance of the *Deshotel* court was on two related arguments broadly applicable to any proposed change in judge-made law. In the light of recent legal history it will be seen that both arguments have outlived their time.

First and foremost, the *Deshotel* court emphasized that the "overwhelming weight of authority" supports the common law rule, and "the courts are justifiably reluctant to depart from established limitations on recovery." (50 Cal.2d at pp. 667, 669.) In the 16 years since *Deshotel* was decided, however, there has been a dramatic reversal in the weight of authority on this question. At the time of *Deshotel* the majority of the states denied the wife the right to recover for loss of consortium, while that right was recognized in only five jurisdictions.[4] Today those 5 have grown in number to at least 31. In 26 of these jurisdictions the change was brought about by

separate property of his wife. A wife may sue in her own name without joining her husband in the suit. Generally a husband and wife have, in the marriage relation, equal rights which should receive equal protection of the law."

Despite this declaration the anachronistic theory of the identity of spouses lingered on in other contexts, and was finally buried by the decisions in which this court held that one spouse can sue the other for a negligent or intentional personal tort (*Self* v. *Self* (1962) 58 Cal.2d 683 [26 Cal.Rptr. 97, 376 P.2d 65], and *Klein* v. *Klein* (1962) 58 Cal.2d 692 [26 Cal.Rptr. 102, 376 P.2d 70]) and that two spouses can be prosecuted for conspiring between themselves to commit a crime (*People* v. *Pierce* (1964) 61 Cal.2d 879 [40 Cal.Rptr. 845, 395 P.2d 893]).

[4]The leading case recognizing the wife's right to recover was *Hitaffer* v. *Argonne Co.* (1950) 183 F.2d 811 [87 App.D.C. 57, 23 A.L.R.2d 1366], overruled on other grounds in *Smither and Company* v. *Coles* (1957) 242 F.2d 220, 226 [100 App. D.C. 68]. *Hitaffer* had been followed by a federal district court declaring it to be the law of Nebraska (*Cooney* v. *Moomaw* (D.Neb. 1953) 109 F.Supp. 448), and by state appellate courts in Arkansas (*Missouri Pacific Transportation Company* v. *Miller* (1957) 227 Ark. 351 [299 S.W.2d 41]), Georgia (*Brown* v. *Georgia-Tennessee Coaches* (1953) 88 Ga.App. 519 [77 S.E.2d 24]), and Iowa (*Acuff* v. *Schmit* (1956) *supra,* 78 N.W.2d 480).

judicial decision,[5] while in 5 it was accomplished by statute.[6] Four states appear to have taken no definitive position on the question.[7] There remain 2 states with statutes which have been construed to deny by implication the right of the wife to recover for loss of consortium,[8] and only 13 which,

---

[5]In addition to the five jurisdictions listed in footnote 4, *ante,* the wife's right to recover for loss of consortium has now been recognized by judicial decision in each of the following states:

Alaska: *Schreiner* v. *Fruit* (Alaska 1974) 519 P.2d 462.

Arizona: *City of Glendale* v. *Bradshaw* (1972) 108 Ariz. 582 [503 P.2d 803].

Delaware: *Yonner* v. *Adams* (1961) 53 Del. 229 [167 A.2d 717].

Florida: *Gates* v. *Foley* (Fla. 1971) 247 So.2d 40.

Idaho: *Nichols* v. *Sonneman* (1966) 91 Idaho 199 [418 P.2d 562].

Illinois: *Dini* v. *Naiditch* (1960) 20 Ill.2d 406 [170 N.E.2d 881, 86 A.L.R.2d 1184].

Indiana: *Troue* v. *Marker* (1969) 253 Ind. 284 [252 N.E.2d 800].

Kentucky: *Kotsiris* v. *Ling* (Ky. 1970) 451 S.W.2d 411.

Maryland: *Deems* v. *Western Maryland Railway Company* (1967) 247 Md. 95 [231 A.2d 514].

Massachusetts: *Diaz* v. *Eli Lilly and Company* (Mass. 1973) 302 N.E.2d 555.

Michigan: *Montgomery* v. *Stephan* (1960) 359 Mich. 33 [101 N.W.2d 227].

Minnesota: *Thill* v. *Modern Erecting Co.* (1969) 284 Minn. 508 [170 N.W.2d 865].

Missouri: *Novak* v. *Kansas City Transit, Inc.* (Mo. 1963) 365 S.W.2d 539.

Montana: *Duffy* v. *Lipsman-Fulkerson & Co.* (D.Mont. 1961) 200 F.Supp. 71.

Nevada: *General Electric Company* v. *Bush* (1972) 88 Nev. 360 [498 P.2d 366].

New Jersey: *Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) 46 N.J. 82 [215 A.2d 1].

New York: *Millington* v. *Southeastern Elevator Co.* (1968) 22 N.Y.2d 498 [293 N.Y.S.2d 305, 239 N.E.2d 897, 36 A.L.R.3d 891].

Ohio: *Clouston* v. *Remlinger Oldsmobile Cadillac, Inc.* (1970) 22 Ohio St.2d 65 [51 Ohio Ops.2d 96, 258 N.E.2d 230].

Pennsylvania: *Hopkins* v. *Blanco* (1973) 224 Pa. Super. 116 [302 A.2d 855].

South Dakota: *Hoekstra* v. *Helgeland* (1959) 78 S.D. 82 [98 N.W.2d 669].

Wisconsin: *Moran* v. *Quality Aluminum Casting Co.* (1967) 34 Wis.2d 542 [150 N.W.2d 137].

[6]Colorado (see *Crouch* v. *West* (1970) 29 Colo.App. 72 [477 P.2d 805, 806]); Mississippi (see *Tribble* v. *Gregory* (Miss. 1974) 288 So.2d 13, 16; New Hampshire (see *Bromfield* v. *Seybolt Motors, Inc.* (1969) 109 N.H. 501 [256 A.2d 151, 152]); Oregon (see *Smith* v. *Smith* (1955) 205 Ore. 286 [287 P.2d 572, 576, 577]); Tennessee (see *Burroughs* v. *Jordan* (1970) 224 Tenn. 418 [456 S.W.2d 652, 653]).

[7]Hawaii, Louisiana, North Dakota, and Rhode Island (but see *Mariani* v. *Nanni* (1962) 95 R.I. 153 [185 A.2d 119, 120] (implying approval of wife's right to recover for loss of consortium)).

[8]Virginia (see *Carey* v. *Foster* (4th Cir. 1965) 345 F.2d 772, 775 (applying Virginia law)); Utah (see *Ellis* v. *Hathaway* (1972) 27 Utah 2d 143 [493 P.2d 985, 986]).

like California, reached that result by judicial decision.[9] The authority of these 13, moreover, is considerably weakened by two factors: a number of the courts express support for the rule allowing recovery by the wife but thus far feel bound to await legislative action on the subject, while others rely heavily on a long line of decisions of their sister jurisdictions which have since been overruled.[10]

The phenomenon of reliance on subsequently overruled authority is dramatically illustrated in *Deshotel* itself. There the court lists, as supporting the denial of the wife's right to recover for loss of consortium, an English case, a Ninth Circuit case finding no California law to the contrary, and, representing "the vast majority of American jurisdictions," 20 cases from other states. (50 Cal.2d at pp. 665-666.) Today, however, no less than 17 of those same 20 cases are no longer the law in their own jurisdictions! The 2 Colorado cases cited in *Deshotel* were superseded by a contrary statute (see fn. 6, *ante*), and the remaining 15 decisions have now been expressly or impliedly overruled by the highest courts of each state

---

[9]Alabama: *Smith* v. *United Construction Workers, District 50* (1960) 271 Ala. 42 [122 So.2d 153].

Connecticut: *Lockwood* v. *Wilson H. Lee Co.* (1956) 144 Conn. 155 [128 A.2d 330].

Kansas: *Hoffman* v. *Dautel* (1964) 192 Kan. 647 [388 P.2d 615].

Maine: *Potter* v. *Schafter* (1965) 161 Me. 340 [211 A.2d 891].

New Mexico: *Roseberry* v. *Starkovich* (1963) 73 N.M. 211 [387 P.2d 321].

North Carolina: *Hinnant* v. *Tide Water Power Co.* (1925) 189 N.C. 120 [126 S.E. 307].

Oklahoma: *Karriman* v. *Orthopedic Clinic* (Okla. 1971) 488 P.2d 1250.

South Carolina: *Page* v. *Winter* (1962) 240 S.C. 516 [126 S.E.2d 570].

Texas: *Garrett* v. *Reno Oil Company* (Tex.Civ.App. 1954) 271 S.W.2d 764.

Vermont: *Baldwin* v. *State* (1965) 125 Vt. 317 [215 A.2d 492].

Washington: *Ash* v. *S. S. Mullen, Inc.* (1953) 43 Wn.2d 345 [261 P.2d 118].

West Virginia: *Seagraves* v. *Legg* (1962) 147 W.Va. 331 [127 S.E.2d 605].

Wyoming: *Bates* v. *Donnafield* (Wyo. 1971) 481 P.2d 347.

[10]Dean Prosser summarizes this historic shift in the law as follows: "The major break came . . . in 1950, in Hitaffer v. Argonne Co., when the District of Columbia Circuit threw overboard the ancient law, and recognized the wife's cause of action for harm to the marriage relation through mere negligent injury to her husband. The decision encountered strong initial opposition, and was rejected in a number of jurisdictions. Around 1958 [i.e., the date of *Deshotel*] something of a current of support for the Hitaffer case set in, and since that date the trend has been definitely in the direction of approval. It now stands accepted, and the wife is allowed her action, in rather more than half of the jurisdictions which have considered the question. Since a considerable number of the courts which have rejected the change have approved it in principle, but have said that it should be for the legislature to make, the prediction is probably justified that the trend will continue . . . ." (Fns. omitted.) (Prosser, Law of Torts (4th ed. 1971) p. 895.)

(see fn. 5, *ante*).[11] Many of these holdings were unanimous, and in a number of instances the overruled decision or its progeny had been on the books a far shorter time than *Deshotel* has been in force in California. Nor were the rulings hesitant or grudging: for example, in *Deshotel* this court relied on the Missouri case of *Bernhardt* v. *Perry* (Mo. 1918) *supra,* 208 S.W. 462, but in *Novak* v. *Kansas City Transit, Inc.* (Mo. 1963) *supra,* 365 S.W.2d 539, 542, the Supreme Court of Missouri declared that *Bernhardt* "is clearly erroneous and manifestly wrong and should not be followed."

As the Massachusetts court observed, "We should be mindful of the trend although our decision is not reached by a process of following the crowd." (*Diaz* v. *Eli Lilly and Company* (1973) *supra,* 302 N.E.2d 555, 561.)[12] Quantitative at first, the trend took a qualitative leap when the American Law Institute reversed its position on the subject not long ago. Consonant with prior law, section 695 of the first Restatement of Torts, published in 1938, had declared that a wife was not entitled to recover for any harm caused to any of her marital interests by one who negligently injured her husband. In 1969, however, at a time when the weight of authority was still slightly against such recovery—although the trend was running in its favor—the institute adopted a new section 695, declaring in relevant part that "One who by reason of his tortious conduct is liable to a husband for illness or other bodily harm is also subject to liability to his wife for resulting loss of his society, including any impairment of his capacity for sexual intercourse. . . ." (Rest.2d Torts (Tent. Draft No. 14, Apr. 15, 1969) § 695, adopted May 21, 1969 (Proceedings of American Law Inst. (46th Annual Meeting, 1969) pp. 148-157).)[13]

In these circumstances we may fairly conclude that the precedential foundation of *Deshotel* has been not only undermined but destroyed. In its place a new common law rule has arisen, granting either spouse the right to recover for loss of consortium caused by negligent injury to the

---

[11]Only the three cases from Oklahoma and Texas are still law in their jurisdictions. (See fn. 9, *ante*.)

[12]The trend of cases allowing the wife's recovery was taken into account in many of the decisions cited in footnote 5, *ante*. In other contexts, this court has also given weight to similarly strong currents of judicial thinking in our sister states. (See, e.g., *Vesely* v. *Sager* (1971) *supra,* 5 Cal.3d 153, 161-162; *Gibson* v. *Gibson* (1971) 3 Cal.3d 914, 922-923 [92 Cal.Rptr. 288, 479 P.2d 648].) And the vast majority of commentators have long supported the movement in favor of recovery for loss of consortium. (See authorities collected in *Gates* v. *Foley* (Fla. 1971) *supra,* 247 So.2d 40, 42-43, fn. 2.)

[13]Section 693 of both the first and second Restatements recognizes an identical right of the husband to recover for loss of his wife's consortium, but includes liability for loss of her services as well.

other spouse. Accordingly, to adopt that rule in California at this time would not constitute, as the court feared in *Deshotel* (50 Cal.2d at p. 667), an "extension" of common law liability, but rather a *recognition* of that liability as it is currently understood by the large preponderance of our sister states and a consensus of distinguished legal scholars.[14]

The second principal rationale of the *Deshotel* opinion (at pp. 668-669 of 50 Cal.2d) was that any departure from the then-settled rule denying the wife recovery for loss of consortium "should be left to legislative action," and defendants in the case at bar echo that plea.[15] But in the years since *Deshotel* the argument has fared badly in our decisions. As we summarized in *People* v. *Pierce* (1964) *supra*, 61 Cal.2d 879, 882, "In effect the contention is a request that courts abdicate their responsibility for the upkeep of the common law. That upkeep it needs continuously, as this case demonstrates."

The judicial responsibility to which we referred in *Pierce* arises from the role of the courts in a common law system. ■ In California as in other jurisdictions of Anglo-American heritage, the common law "is not a codification of exact or inflexible rules for human conduct, for the redress of injuries, or for protection against wrongs, but is rather the embodiment of broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice, and adopted by common consent for the regulation and government of the affairs of men.

" . . . . . . . . . . . . . . . . . . . . .

[14]It is true that most of the jurisdictions now recognizing the wife's right to recover for loss of her husband's consortium (see fn. 5, *ante*) had previously recognized the husband's right, derived from the common law, to recover for loss of his wife's consortium. In these jurisdictions, therefore, the cases granting recovery to the wife had the effect of equalizing the consortium rights of the spouses. But such equalization was the *ratio decidendi* of only a very few of the cases. (See, e.g., *Deems* v. *Western Maryland Railway Company* (1967) *supra*, 231 A.2d 514.) The vast majority of these courts mentioned in passing the prior disparity in the spouses' positions, but went on to base their decision upon a thorough analysis and rejection of the arguments relied on in *Deshotel*. Moreover, in several states the right to recover for loss of consortium was recognized even though, as in California after *West*, the husband had been deprived of his consortium right by an earlier decision and hence neither spouse had been entitled to relief. (Compare *Jacobson* v. *Fullerton* (1917) 181 Iowa 1195 [165 N.W. 358, 360], with *Acuff* v. *Schmit* (1956) *supra*, 78 N.W.2d 480; compare *Bolger* v. *Boston Elevated Ry. Co.* (1910) 205 Mass. 420 [91 N.E. 389], with *Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555; compare *Blair* v. *Seitner Dry Goods Co.* (1915) 184 Mich. 304 [151 N.W. 724, 727], with *Montgomery* v. *Stephan* (1960) *supra*, 101 N.W.2d 227.)

[15]This is the main reason for the holding in *West* denying a husband the right to recover in California for the loss of his wife's consortium (see 54 Cal.2d at p. 477).

"The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society, and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the country." (Fns. omitted.) (15 Am.Jur.2d, Common Law, §§ 1, 2, pp. 794-796.)[16]

In short, as the United States Supreme Court has aptly said, "This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law." (*Hurtado* v. *California* (1884) 110 U.S. 516, 530 [28 L.Ed. 232, 237, 4 S.Ct. 111, 292].) **(2)** But that vitality can flourish only so long as the courts remain alert to their obligation and opportunity to change the common law when reason and equity demand it: "The nature of the common law requires that each time a rule of law is applied, it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice." (Fns. omitted.) (15 Am.Jur.2d, Common Law, § 2, p. 797.) Although the Legislature may of course speak to the subject, in the common law system the primary instruments of this evolution are the courts, adjudicating on a regular basis the rich variety of individual cases brought before them.

While the courts of California have long exercised this power to insure the just and rational development of the common law in our state (see, e.g., *Katz* v. *Walkinshaw* (1903) 141 Cal. 116, 123-124 [70 P. 663, 74 P. 766]), it is perhaps since *Deshotel* that the independence of the judicial branch in this regard has been most firmly asserted. Shortly after *Deshotel* the decision in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], dealt a major blow to the contention that reconsideration of settled common law rules should await action by the Legislature. The issue there was the continued viability of the doctrine of sovereign immunity in California. In *Talley* v. *Northern San Diego Hosp. Dist.* (1953) 41 Cal.2d 33, 41 [257 P.2d 22], this court had unequivocally stated that "Whether the doctrine of sovereign immunity should be modified in this state is a legislative question." In *Vater* v. *County of Glenn*

---

[16]Justice Story put it this way: "The common law is gradually changing its old channels, and wearing new. It has continual accessions on some sides; and, on others, leaves behind vast accumulations, which now serve little other purpose than to show, what were its former boundaries." (Story, Miscellaneous Writings (1835) p. 307.)

(1958) 49 Cal.2d 815, 820 [323 P.2d 85], the court recognized that most contemporary legal scholars strongly advocated abolition of the principle of sovereign immunity, but nevertheless reiterated that "the abrogation or restriction of this doctrine is primarily a legislative matter . . . ." Less than three years later, however, *Muskopf* abolished sovereign immunity by judicial decree. We emphasized that the doctrine "was originally court made" (55 Cal.2d at p. 218), and observed that "we are apt to forget that when there is negligence, the rule is liability, immunity is the exception." (*Id.* at p. 219.) Finding no valid reason for continuing the exception of sovereign immunity, we put an end to it.[17]

More recently, we rejected the argument in favor of deferring to legislative action in our reconsideration of the rule denying liability for the sale of alcoholic beverages to a customer who becomes intoxicated and injures a third person. In *Cole* v. *Rush* (1955) 45 Cal.2d 345, 354 [289 P.2d 450, 54 A.L.R.2d 1137], this court squarely held that any change in the doctrine of immunity for such injury must come by legislative action: for the court to abrogate the common law rule, we said, "would at the least constitute a departure from its constitutional function and an encroachment upon that of the Legislature." Yet we judicially abolished this doctrine in *Vesely* v. *Sager* (1971) *supra,* 5 Cal.3d 153, and we did so despite our recognition of the foregoing reasoning of *Cole* (*id.* at p. 161) and of the fact that in many states the common law rule of immunity had been abrogated by statute (*id.* at p. 159).

The defendant in *Vesely* urged, as the court declared in *Deshotel* (50 Cal.2d at p. 668), that the matter should be left to the Legislature because that body is better equipped to define the scope of liability and resolve various related procedural problems. The argument fell on deaf ears. We simply stressed that the challenged immunity was based on a "judicially created rule," which "is patently unsound and totally inconsistent with the principles of proximate cause established in other areas of negligence law. Other common law tort rules which were determined to be lacking in validity have been abrogated by this court [citing *Gibson* and *Muskopf*], and there is no sound reason for retaining the common law rule presented in this case." (*Id.* at p. 166.)

[17]We noted (*ibid.*) that we had likewise "implemented that policy" in favor of liability for negligence when we abolished the doctrine of tort immunity of charitable institutions (*Malloy* v. *Fong* (1951) 37 Cal.2d 356 [232 P.2d 241], and *Silva* v. *Providence Hospital of Oakland* (1939) 14 Cal.2d 762 [97 P.2d 798]), "an immunity that was also claimed to be so firmly imbedded that only the Legislature could change it."

Finally, in several additional post-*Deshotel* decisions we have judicially abolished long-standing common law tort rules over the specific objection that the question should have been left for legislative action. (See, e.g., *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 121 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] [abandoning distinction between business invitee, social guest, and trespasser, with regard to liability for dangerous conditions of land]; *Dillon* v. *Legg* (1968) *supra,* 68 Cal.2d 728, 752 [allowing recovery for fear-induced bodily injury to parent caused by witnessing negligent injury to child]; *Klein* v. *Klein* (1962) *supra,* 58 Cal.2d 692, 697-699 [abrogating rule of interspousal unity for negligent torts].)

■ The rule denying the wife recovery for loss of consortium is no less a judicial creation than any of the foregoing. Recognizing this fact, the highest courts of our sister states have time and again rejected, since *Deshotel,* the argument that the rule can be changed only by legislative action. (See, e.g., *Schreiner* v. *Fruit* (Alaska 1974) *supra,* 519 P.2d 462, 465; *Kotsiris* v. *Ling* (Ky. 1970) *supra,* 451 S.W.2d 411, 412; *Novak* v. *Kansas City Transit, Inc.* (Mo. 1963) *supra,* 365 S.W.2d 539, 546, 547; *Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) *supra,* 215 A.2d 1, 8; *Hoekstra* v. *Helgeland* (1959) *supra,* 98 N.W.2d 669, 683.)

Thus in *Montgomery* v. *Stephan* (1960) *supra,* 101 N.W.2d 227, 229, the Michigan Supreme Court observed that "Were we to rule upon precedent alone, were stability the only reason for our being, we would have no trouble with this case. We would simply tell the woman to begone, and to take her shattered husband with her, that we need no longer be affronted by a sight so repulsive. In so doing we would have vast support from the dusty books. But dust the decision would remain in our mouths through the years ahead, a reproach to law and conscience alike. Our oath is to do justice, not to perpetuate error." The court rejected the precedents denying recovery for loss of consortium as "out of harmony with the conditions of modern society. They do violence to our convictions and our principles. We reject their applicability. The reasons for the old rule no longer obtaining, the rule falls with it. The obstacles to the wife's action were judge-invented and they are herewith judge-destroyed." (*Id.* at p. 235.)

In *Dini* v. *Naiditch* (1960) *supra,* 170 N.E.2d 881, 892, the Illinois Supreme Court cited *Deshotel* as illustrative of decisions holding the wife's remedy lies with the Legislature. The court totally disagreed with that reasoning, saying, "We find no wisdom in abdicating to the legislature our essential function of re-evaluating common-law concepts in the light of present day realities. Nor do we find judicial sagacity in continually look-

ing backward and parroting the words and analyses of other courts so as to embalm for posterity the legal concepts of the past."

In *Millington* v. *Southeastern Elevator Co.* (1968) *supra,* 293 N.Y.S.2d 305, 313, the New York Court of Appeals correctly conceived its common law responsibilities in rejecting the argument that any change in the rule against recovery for loss of consortium should come from the Legislature: "No recitation of authority is needed to indicate that this court has not been backward in overturning unsound precedent in the area of tort law. . . . 'We act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice. . . . Legislative action there could, of course, be, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule.' "

Other courts have been faced, as we are today, with earlier decisions of their own declining to change the rule against recovery for loss of consortium on the express ground that the question was for the Legislature. Despite this fact, these courts did not await legislative action once they became convinced the rule was outdated and unjust. Instead they forthrightly so declared and overruled their decisions to the contrary.

Thus in *Jeune* v. *Del E. Webb Const. Co.* (1954) 77 Ariz. 226 [269 P.2d 723, 724], relied on in *Deshotel,* the court said "we have no right to remake the common law as was attempted in Hitaffer v. Argonne Co., supra." But in *City of Glendale* v. *Bradshaw* (1972) *supra,* 503 P.2d 803, 805, the court unanimously overruled *Jeune,* quoted with approval from *Hitaffer,* and explained that " 'When we find that the common law or "judge-made law" is unjust or out of step with the times, we have no reluctance to change it.' "

In *Ripley* v. *Ewell* (Fla. 1952) 61 So.2d 420, 423, also relied on in *Deshotel,* the court said that many of the *Hitaffer* arguments "are founded on sound reasoning and . . . logically support the conclusion reached if considered as an argument of what the law should be. They might well appeal to the Legislature," and concluded that "If further changes are desirable in the public interest, the changes should come from legislation." (*Id.* at p. 424.) Yet in *Gates* v. *Foley* (Fla. 1971) *supra,* 247 So.2d 40, 43, the court rejected the identical argument, unanimously overruled *Ripley,* and observed, "The law is not static. It must keep pace with changes in our

society, for the doctrine of stare decisis is not an iron mold which can never be changed."[18]

Perhaps the most striking example of this sequence of rulings took place recently in Massachusetts. In 1971 the Massachusetts Supreme Judicial Court reaffirmed its earlier decisions adopting the common law rule against recovery for loss of consortium; although recognizing the contrary trend in other states, the court said, "If a rule of such long standing is to be changed, we are of opinion that any modification should be accomplished by the Legislature and not by judicial decision." (*Lombardo* v. *D. F. Frangioso & Co.* (1971) 359 Mass. 529 [269 N.E.2d 836, 837].) Only two years later, however, the court itself changed the rule, saying, "In a field long left to the common law, change may well come about by the same medium of development. Sensible reform can here be achieved without the articulation of detail or the creation of administrative mechanisms that customarily comes about by legislative enactment. Indeed the Legislature may rationally prefer to act, if it acts at all, after rather than before the common law has fulfilled itself in its own way. In the end the Legislature may say that we have mistaken the present public understanding of the nature of the marital relation, but that we cannot now divine or anticipate." (Fns. omitted.) (*Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555, 563-564.)

We agree with this reasoning. Whatever may have been the correct approach at the time of *Deshotel,* the question today is whether the rule against recovery for loss of consortium should survive on its merits as a judicially declared principle of our tort law. If upon further analysis it appears the remaining reasons given in *Deshotel* no longer support that rule—no new reasons are suggested by the parties to this appeal—we shall have no hesitation in abrogating it. ■ Such a step would not be a usurpation of legislative authority, but a reaffirmation of our high responsibility to renew the common law of California when it is necessary and proper to do so.

---

[18]In another case relied on in *Deshotel, Nickel* v. *Hardware Mutual Casualty Company* (1955) 269 Wis. 647 [70 N.W.2d 205, 208], the court held that any departure from the rule against recovery for loss of consortium must be made by the Legislature, "whose function and exclusive province it is." Nevertheless, in *Moran* v. *Quality Aluminum Casting Co.* (1967) *supra*, 150 N.W.2d 137, 141, the court unanimously overruled *Nickel* and judicially adopted the contrary rule.

*The injury is indirect, the damages speculative, and the cause of action would extend to other classes of plaintiffs.*

Under this heading we group three arguments relied on in *Deshotel* which could be invoked against any proposed recognition of a new cause of action sounding in tort. As will appear, each has been refuted by application of fundamental principles of the law of negligence.

First the *Deshotel* court asserted that "Any harm [the wife] sustains occurs *only indirectly* as a consequence of the defendant's wrong to the husband" (italics added; 50 Cal.2d at p. 667). The argument was negated 10 years after *Deshotel* in *Dillon* v. *Legg* (1968) *supra*, 68 Cal.2d 728. There the issue was whether a driver who negligently runs over a small child in the street is also liable to the child's mother for emotional shock and resulting physical disorders suffered by the latter when she personally witnessed the occurrence of the accident. Finding such liability, we in effect rejected the argument that the injury to the mother was too "indirect." The critical question, we explained, was foreseeability: "In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable." (*Id.* at p. 739.) The defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous. (*Ibid.*) The foreseeable risk need not be of an actual physical impact, but may be of emotional trauma alone. (*Id.* at pp. 739-740.) Whether a risk is sufficiently foreseeable to give rise to a duty of care depends on the circumstances of each case, including the relationship of the parties and the nature of the threatened injury. (*Id.* at p. 741.) We concluded that "In light of these factors the court will determine whether the accident and harm was *reasonably* foreseeable. Such reasonable foreseeability does not turn on whether the particular [defendant] as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected." (*Ibid.*)

Applying these rules to the facts alleged, we were of the opinion in *Dillon* that "Surely the negligent driver who causes the death of a young child may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma." (*Ibid.*) By

parity of reasoning, we conclude in the case at bar that one who negligently causes a severely disabling injury to an adult may reasonably expect that the injured person is married and that his or her spouse will be adversely affected by that injury. In our society the likelihood that an injured adult will be a married man or woman is substantial,[19] clearly no less than the likelihood that a small child's mother will personally witness an injury to her offspring. And the probability that the spouse of a severely disabled person will suffer a personal loss by reason of that injury is equally substantial.

The latter point has been forcefully made in a number of decisions since *Deshotel* rejecting the argument that the wife's loss of consortium is too indirect an injury to be compensated. Thus the New York Court of Appeals said in *Millington* v. *Southeastern Elevator Co.* (1968) *supra*, 293 N.Y.S.2d 305, 308, "Disparagingly described as 'sentimental' or 'parasitic' damages, the mental and emotional anguish caused by seeing a healthy, loving companionable mate turned into a shell of a person is real enough. To describe the loss as 'indirect' is only to evade the issue. The loss of companionship, emotional support, love, felicity and sexual relations are real injuries. The trauma of having to care for a permanent invalid is known to have caused mental illness. There may not be a deterioration in the marital relationship, but it will certainly alter it in a tragic way. Even in the case of a husband the 'sentimental' damages may predominate over the loss of support or material element. Thus to describe these damages as merely parasitic is inaccurate and cruel."

Similarly, the Ohio Supreme Court observed in *Clouston* v. *Remlinger Oldsmobile Cadillac, Inc.* (1970) *supra*, 258 N.E.2d 230, 235, "There certainly is no doubt today that the wife of a husband who has been incapacitated suffers great pain and endures constant anguish, particularly if she is denied the opportunity to have children. . . . When a person is injured either intentionally or negligently, to the extent that such person can no longer be a companion and is no longer capable of giving love, affection, society, comfort and sexual relations to his or her spouse, that spouse has suffered a direct and a real personal loss."

For these reasons, as the Supreme Court of New Jersey declared in *Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) *supra*, 215 A.2d 1, 5, 8,

---

[19] As of 1972, 74.8 percent of all men in the United States over age 18 were married. During the peak working years of ages 25 to 65, the proportion of married men ranged between 77.8 percent and 89.7 percent. In the case of women the corresponding figures are 68.5 percent for all adult females and 69.5 percent to 87.3 percent for women between the ages of 25 and 65. (Statistical Abstract of the United States (94th ed. 1973) p. 38, table No. 47.)

"The position that [the wife's] injuries are indirect or too remote to warrant legal protection runs counter to basic principles of negligence and causation . . . . While engaging in their activities, the defendants clearly came under the comprehensive common law duty of due care with tort liability for its breach. If, as alleged, they acted without due care causing serious bodily injury to the husband and consortium deprivation to the wife, they should, in all justice, be held liable in fair measure for the respective losses. *Those losses were immediate and consequential rather than remote and unforeseeable* and, there being no sufficient countervailing policy, the law now rightly views them as remediable by the responsible tortfeasors." (Italics added.) The principles of *Dillon* v. *Legg* permit of no other conclusion.

The next rationale of the *Deshotel* court (50 Cal.2d at p. 667) was that "the measurement of damage for the loss of such things as companionship and society would involve conjecture since their value would be hard to fix in terms of money." This argument, too, has fared badly in our subsequent decisions. ■ Although loss of consortium may have physical consequences, it is principally a form of mental suffering. We have fully recognized that "One of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy." (*Beagle* v. *Vasold* (1966) 65 Cal.2d 166, 172 [53 Cal.Rptr. 129, 417 P.2d 673].) "Yet," we emphasized in *Beagle* (at p. 176), "the inescapable fact is that this is precisely what the jury is called upon to do."

More recently, we observed that under the concept of pain and suffering "a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal. [Citations.] Admittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. [Citations.] But the detriment, nevertheless, is a genuine one that requires compensation [citations], and the issue generally must be resolved by the 'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence.' [Citations.] [¶] Indeed, mental suffering frequently constitutes the principal element of tort

damages (Rest.2d Torts, § 905, com. c); awards which fail to compensate for pain and suffering have been held inadequate as a matter of law. [Citations.]" (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880].)

Again the out-of-state decisions have applied these basic principles to the typical loss of consortium case, and have rejected the argument relied on in *Deshotel.* Thus the Massachusetts high court reasoned that "The marital interest is quite recognizable and its impairment may be definite, serious, and enduring, more so than the pain and suffering or mental or psychic distress for which recovery is now almost routinely allowed in various tort actions. The valuation problem here may be difficult but is not less manageable." (*Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555, 563.) And the New York Court of Appeals ruled, "It is also contended that the 'sentimental' damages such as the diminution of the value of her husband's society and affection and the deprivation of sexual relations and the attendant loss of child-bearing opportunity are too personal, intangible, and conjectural to be measured in pecuniary terms by a jury. This argument has no merit. The logic of it would also hold a jury incompetent to award damages for pain and suffering. [¶] Money is a poor substitute for the loss of an only child or the pain resulting from serious injuries. Likewise, it cannot truly compensate a wife for the destruction of her marriage, but it is the only known means to compensate for the loss suffered and to symbolize society's recognition that a culpable wrong—even if unintentional—has been done." (*Millington* v. *Southeastern Elevator Co.* (1968) *supra*, 293 N.Y.S.2d 305, 312.) That the law cannot do enough, in short, is an unacceptable excuse for not doing anything at all.

The third argument of this group set forth in *Deshotel* is that if the wife's cause of action were recognized "on the basis of the intimate relationship existing between her and her husband, other persons having a close relationship to the one injured, such as a child or parent, would likely seek to enforce similar claims, and the courts would be faced with the perplexing task of determining where to draw the line with respect to which claims should be upheld." (50 Cal.2d at pp. 667-668.) Here again the answer was subsequently given in *Dillon* v. *Legg.* In that case it was likewise urged that any cause of action granted to a mother who witnesses her child's injury could also be asserted by other close relatives present at the scene such as siblings or grandparents, thus involving the courts "in the hopeless task of defining the extent of the tortfeasor's liability." (68 Cal.2d at p. 730.)

We rejected this argument in *Dillon* on the ground that "the alleged inability to fix definitions for recovery on the different facts of future cases does not justify the denial of recovery on the specific facts of the instant case; in any event, proper guidelines can indicate the extent of liability for such future cases." (*Id.* at p. 731.) Those guidelines, as noted hereinabove, are the general principles of negligence law limiting liability to persons and injuries within the scope of the reasonably foreseeable risk. "We do not believe that the fear that we cannot successfully adjudicate future cases of this sort, pursuant to the suggested guidelines, should bar recovery in an otherwise meritorious cause." (*Id.* at pp. 743-744.) We noted (at p. 743) that in sanctioning recovery for injury caused by intentional infliction of mental distress (*State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330 [240 P.2d 282]), "this court did not defer to the argument that liability should not be imposed because of the possible future difficulty in delimiting the area of liability." Similarly, in imposing strict liability in tort for a defective manufactured product (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]), "we were not halted by the spectre of an inability to pre-judge every future case." We concluded in *Dillon* (at p. 747), "Legal history shows that artificial islands of exceptions, created from the fear that the legal process will not work, usually do not withstand the waves of reality and, in time, descend into oblivion."

The same reasoning has led the courts of other states to reject this argument in loss of consortium cases. Thus in *Novak* v. *Kansas City Transit, Inc.* (Mo. 1963) *supra*, 365 S.W.2d 539, 546, the court said, "In the present case, we have for decision only the question whether the wife should be permitted to recover for the loss of consortium of her husband under existing conditions. If she should be so permitted, the fact that to so hold might cause others to *assert* causes of action, e.g., a child or parent, is no reason to deny a wife an existing right of action." (Italics in original.) Recognizing the traditional power of the courts to control the development of a judge-made rule of law, the court in *Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555, 563, stated: "Nor does it follow that if the husband-wife relationship is protected as here envisaged, identical protection must be afforded by analogy to other relationships from that of parent-child in a lengthy regress to that of master-servant; courts will rather proceed from case to case with discerning caution." (Fn. omitted.)

Dismissing the same argument, the New Jersey court stated that "The law has always been most solicitous of the husband and wife relationship,

perhaps more so than the parent and child relationship. [Citation.] In any event, policy rather than logic is the determinative factor and, while persuasive arguments may be mustered in favor of the child's claim (Prosser, supra, at p. 919), the reciprocal recognition of the wife's claim may readily be rested on its own footing of equality and justice without any compulsion of going further." *(Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) *supra,* 215 A.2d 1, 6-7.) That the law might be urged to move too far, in other words, is an unacceptable excuse for not moving at all.

*The fear of double recovery and of the retroactive effect*
*of a judicial rule.*

In this final group we deal with two *Deshotel* arguments which apply principally to loss of consortium cases. As will appear, the overwhelming majority of decisions since *Deshotel* have established that each of these objections is without substance and can satisfactorily be resolved by procedural means.

First, the *Deshotel* court expressed the concern that "A judgment obtained by a husband after he is injured by a third person might include compensation for any impairment of his ability to participate in a normal married life, and, if his wife is allowed redress for loss of consortium in a separate action, there would be danger of double recovery." (50 Cal. 2d at p. 667.) Virtually every decision granting the wife the right to recover for loss of consortium since *Deshotel* has considered and rejected this argument (see fn. 5, *ante*), calling it "fallacious,"[20] "fictional,"[21] and a "bogey" that is "merely a convenient cliche" for denying the wife her action for loss of consortium.[22] The cases have made it crystal clear that, in the quoted words of *Deshotel,* recovery of damages for impairment of "his" ability to participate in a normal married life does not necessarily compensate for the impairment of "her" ability to participate in that life.

It is true the rule against double recovery forecloses the wife from recovering for the loss of her husband's financial support if he is compensated for his loss of earnings and earning power, "because the *source* of the wife's right to support is the husband's earning capacity, for impairment of which *he* is entitled to recover." (Italics in original.) *(Kotsiris* v. *Ling* (Ky. 1970) *supra,* 451 S.W.2d 411, 412.) But there is far more to the marriage relationship than financial support. "The

---

[20]*Novak* v. *Kansas City Transit, Inc.* (Mo. 1963) *supra,* 365 S.W.2d 539, 543.

[21]*Clouston* v. *Remlinger Oldsmobile Cadillac, Inc.* (1970) *supra,* 258 N.E.2d 230, 234.

[22]*Dini* v. *Naiditch* (1960) *supra,* 170 N.E.2d 881, 891.

concept of consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more." (*Millington* v. *Southeastern Elevator Co.* (1968) *supra,* 293 N.Y.S.2d 305, 308.) As to each, "the interest sought to be protected is personal to the wife" (*ibid.*), so that to compensate her for damage to that interest cannot result in double recovery.

Perhaps the most undeniable proof of the separate and distinct losses of husband and wife is seen when, as in the case at bar, there is impairment or destruction of the sexual life of the couple. "Today, at least, it is unquestioned that the desire to have children and the pleasures of sexual intercourse are mutually shared. If the husband's potency is lost or impaired, it is both the man and woman who are affected." (*Deems* v. *Western Maryland Railway Company* (1967) *supra,* 231 A.2d 514, 522.) More specifically, the Delaware court quoted the foregoing language of *Deshotel* and a similar case, and commented: "The difficulty I find with these analyses is their failure to distinguish the injured husband's personal loss from the separate, distinct and legally recognized loss suffered by his wife. Take the case of a husband who suffers an incapacitating injury to his reproductive organs. In his personal injury suit it is clear that his damages are predicated upon *his* physical injury which precludes him from copulation, procreation, and an otherwise full enjoyment of his marital state. However, the wife's loss is just as real as it is distinct. She can no longer enjoy *her* legally sanctioned and morally proper privilege of copulation or procreation, and is otherwise deprived of *her* full enjoyment of her marital state. These are *her* rights, not his." (Italics in original.) (*Yonner* v. *Adams* (1961) *supra,* 167 A.2d 717, 728.)

Nor is the wife's personal loss limited to her sexual rights. As we recognized in *Deshotel* (50 Cal.2d at p. 665), consortium includes "conjugal society, comfort, affection, and companionship." An important aspect of consortium is thus the *moral* support each spouse gives the other through the triumph and despair of life. A severely disabled husband may well need all the emotional strength he has just to survive the shock of his injury, make the agonizing adjustment to his new and drastically restricted world, and preserve his mental health through the long years of frustration ahead. He will often turn inwards, demanding more solace for himself than he can give to others. Accordingly, the spouse of such a man cannot expect him to share the same concern for *her* problems that she experienced before his accident. As several of the cases have put it, she is transformed from a happy wife into a lonely nurse. Yet she is entitled to enjoy the companionship and moral support that marriage provides no

less than its sexual side, and in both cases no less than her husband. If she is deprived of either by reason of a negligent injury to her husband, the loss is hers alone. "In the light of the foregoing the danger of double recovery is not real for presumably the husband is recovering for his own injuries and she is recovering for injury done to herself by the loss of his companionship. There is no duplication, instead, this is an example of a single tortuous act which harms two people by virtue of their relationship to each other." (*General Electric Company* v. *Bush* (1972) *supra*, 498 P.2d 366, 371.)

"The key to the present problem can thus be seen as procedural." (*Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555, 561.) All that is necessary to avoid double recovery "is to insure that each element of the damages is separate and distinct from all the others" (*City of Glendale* v. *Bradshaw* (1972) *supra*, 503 P.2d 803, 805), and in particular that the wife's recovery does not include any damages for loss of her husband's financial support or other items for which *he* is primarily entitled to be compensated. There is no mystery about how this can be accomplished. The cases since *Deshotel* have achieved the desired result either by requiring that such items be carefully identified at trial by appropriate rulings and the jury be instructed to exclude them from any verdict that may be rendered for the wife,[23] or by directing that any such items be deducted by the trial court from the wife's verdict if it appears they figured therein.[24] Similar procedures are available in California, and for the reasons given in the cited cases we believe they will effectively forestall the possibility of double recovery which concerned the court in *Deshotel*.

The *Deshotel* court spoke of recovery by the wife "in a separate action" (50 Cal.2d at p. 667). But any dangers implicit in such an action can be avoided by joinder. On this point the cases are almost equally divided: in six jurisdictions it has been held that the wife *must* join her cause of action for loss of consortium for trial with her husband's cause of action

[23]*Gates* v. *Foley* (Fla. 1971) *supra*, 247 So.2d 40, 45; *Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555, 561; *Novak* v. *Kansas City Transit, Inc.* (Mo. 1963) *supra*, 365 S.W.2d 539, 544; *General Electric Company* v. *Bush* (1972) *supra*, 498 P.2d 366, 371; *Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) *supra*, 215 A.2d 1, 5-6; *Millington* v. *Southeastern Elevator Co.* (1968) *supra*, 293 N.Y.S. 2d 305, 307; *Clouston* v. *Remlinger Oldsmobile Cadillac, Inc.* (1970) *supra*, 258 N.E.2d 230, 234; *Hoekstra* v. *Helgeland* (1959) *supra*, 98 N.W.2d 669, 682-683.

[24]*Dini* v. *Naiditch* (1960) *supra*, 170 N.E.2d 881, 891; *Troue* v. *Marker* (1969) *supra*, 252 N.E.2d 800, 806; *Montgomery* v. *Stephan* (1960) *supra*, 101 N.W.2d 227, 231.

for negligence,[25] while in five others that view has been rejected as too rigid, and joinder, although strongly encouraged, is not mandatory.[26] The latter position accords with the current California statutory scheme. Perhaps the best reasoned opinion on the subject is *Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555.[27] The court there explained (at pp. 560-561): "As a practical matter, the consortium claim, when asserted at all, will usually be presented together with the negligence claim for the physical injuries, husband and wife joining in the same action. Such joinder is of course permitted and invited by the procedural rules. When, perchance, separate actions have been brought, the defendant (or plaintiffs in the actions) would normally be entitled to have them consolidated for trial. Further, we think the defendant could ordinarily insist, if he considered it to his advantage, that the other spouse be joined in the main negligence action so that a possible claim for loss of consortium should not be outstanding when the negligence claim was disposed of, leaving a possibility of duplicating recoveries." (Fns. omitted.)

The *Diaz* court relied for these conclusions on Massachusetts procedural rules governing permissive joinder, consolidation, and compulsory joinder, all based on the corresponding provisions of the Federal Rules of Civil Procedure. California has recently adopted the identical rules,[28] and we do not doubt that their interplay, along the lines suggested in *Diaz*, will permit the orderly disposition of all future claims for loss of consortium.[29]

[25]*Schreiner* v. *Fruit* (Alaska 1974) *supra*, 519 P.2d 462, 466; *Deems* v. *Western Maryland Railway Company* (1967) *supra*, 231 A.2d 514, 521-525; *Thill* v. *Modern Erecting Co.* (1969) *supra*, 170 N.W.2d 865, 870; *General Electric Company* v. *Bush* (1972) *supra*, 498 P.2d 366, 371; *Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) *supra*, 215 A.2d 1, 6; *Hopkins* v. *Blanco* (1973) *supra*, 302 A.2d 855, 858-859.

[26]*Gates* v. *Foley* (Fla. 1971) *supra*, 247 So.2d 40, 45; *Kotsiris* v. *Ling* (Ky. 1970) *supra*, 451 S.W.2d 411, 412-413; *Diaz* v. *Eli Lilly and Company* (1973) *supra*, 302 N.E.2d 555, 560-561; *Millington* v. *Southeastern Elevator Co.* (1968) *supra*, 293 N.Y.S.2d 305, 308-309; *Fitzgerald* v. *Meissner & Hicks, Inc.* (1968) 38 Wis.2d 571 [157 N.W.2d 595, 599-600], modifying *Moran* v. *Quality Aluminum Casting Co.* (1967) *supra*, 150 N.W.2d 137, 145.

[27]The author of *Diaz* is Justice Benjamin Kaplan, an eminent scholar of civil procedure during his many years on the faculty of Harvard Law School.

[28]*Permissive Joinder*: Code of Civil Procedure section 378, based on federal rule 20.

*Consolidation*: Code of Civil Procedure section 1048, based on federal rule 42.

*Compulsory Joinder*: Code of Civil Procedure section 389, based on federal rule 19.

[29]In the case at bar, for example, Richard Rodriguez originally filed a complaint for his damages alone. Subsequently, but within the statute of limitations, he and Mary Anne filed an amended complaint joining their causes of action under the

The final argument advanced in *Deshotel* is that a judicial recognition of the wife's' cause of action for loss of consortium would operate retro-. actively and "might work hardship upon persons who, in reliance upon the common law rule, have made settlement with the husband, believing that the wife could not sue." (50 Cal.2d at p. 668.) This argument, too, has been rejected in many of the post-*Deshotel* decisions allowing recovery for loss of consortium. As the New York Court of Appeals observed, "The problem has not troubled other courts seriously and may easily be resolved." (*Millington* v. *Southeastern Elevator Co.* (1968) *supra,* 293 N.Y.S.2d 305, 312.)

The solution of the majority of the other courts, which we adopt, is simply to declare that for reasons of fairness and sound administration a spouse will not be permitted to initiate an action for loss of consortium— even though not barred by the statute of limitations—when the action of the other spouse for the negligent or intentional injury giving rise to such loss was concluded by settlement or judgment prior to the effective date of this decision. (*Deems* v. *Western Maryland Railway Company* (1967)'*supra,* 231 A.2d 514, 525; *Diaz* v. *Eli Lilly and Company* (1973) *supra,* 302 N.E.2d 555, 564; *Ekalo* v. *Constructive Serv. Corp. of Am.* (1965) *supra,* 215 A.2d 1, 8; *Millington* v. *Southeastern Elevator Co.* (1968) *supra,* 293 N.Y.S.2d 305, 312; but see *Kotsiris* v. *Ling* (Ky. 1970) *supra,* 451 S.W.2d 411, 413; *Shepherd* v. *Consumers Cooperative Association* (Mo. 1964) 384 S.W.2d 635, 638-640.)[30]

■ We therefore overrule *Deshotel* v. *Atchison, T. & S. F. Ry. Co.* (1958) *supra,* 50 Cal.2d 664, and *West* v. *City of San Diego* (1960) *supra,* 54 Cal.2d 469, 475-478, and declare that in California each spouse has a cause of action for loss of consortium, as defined herein, caused by a negligent or intentional injury to the other spouse by a third party.

permissive joinder statute. We suggest that hereafter the preferred method for asserting a claim of loss of consortium will be to join such a cause of action in the initial pleading with the other spouse's cause of action for negligent or intentional injury, pursuant to Code of Civil Procedure section 378.

[30]It is probable that few if any such claims exist in any event, as serious injury cases are rarely settled or brought to judgment within one year after the occurrence of the injury, the governing period of limitations (Code Civ. Proc., § 340, subd. 3). With the exception of such cases, all claims for loss of consortium not barred by the statute of limitations may now be asserted: for the reasons persuasively stated in *Fitzgerald* v. *Meissner & Hicks, Inc.* (1968) *supra,* 157 N.W.2d 595, 598-599, our decision herein is to be given normal retroactive effect within the limits of the statute of limitations.

It follows that the court below erred in sustaining the general demurrers to the second cause of action of the complaint, and the judgment of dismissal as to Mary Anne must be reversed.

Inasmuch as further proceedings may now be had on the second cause of action, we deem it appropriate to discuss briefly the items of damages prayed for on that count. █ ██ In view of our holding herein, Mary Anne's prayer for general damages is good and may be supported by proof, if any she has, of loss or impairment of her rights of consortium.[31] ██ Her prayer for the reasonable value of the nursing services she furnishes her husband, however, cannot be maintained. We do not doubt, as Mary Anne says in her declaration, that no hired nurse or attendant could give Richard the same degree of personal devotion, patience, and understanding that she as a wife can give him. But should he prevail in his own cause of action against these defendants, he will be entitled to recover, among his medical expenses, the full cost of whatever home nursing is necessary. To allow Mary Anne also to recover the value of *her* nursing services, however personalized, would therefore constitute double recovery. (*Tribble* v. *Gregory* (Miss. 1974) *supra*, 288 So.2d 13, 17; *Kotsiris* v. *Ling* (Ky. 1970) *supra*, 451 S.W.2d 411, 412.) ██ For the same reason, Mary Anne cannot recover for the loss of her earnings and earning capacity assertedly incurred when she quit her job in order to furnish Richard these same nursing services. To do so would be to allow her to accomplish indirectly that which we have just held she cannot do directly.

The judgment appealed from is reversed.

Wright, C. J., Tobriner, J., Burke, J., Sullivan, J., and Clark, J., concurred.

**McCOMB, J.**—I dissent. I adhere to the view that any change in the law denying the wife recovery for loss of consortium should be left to legislative action. (*Deshotel* v. *Atchison, T. & S. F. Ry. Co.*, 50 Cal.2d 664, 669 [328 P.2d 449].)

---

[31]We note in particular that in the allegations of the second cause of action Mary Anne complains of the loss of Richard's household services. The deprivation of a husband's physical assistance in operating and maintaining the family home is a compensable item of loss of consortium. (*Tribble* v. *Gregory* (Miss. 1974) *supra*, 288 So.2d 13, 17; *Kotsiris* v. *Ling* (Ky. 1970) *supra*, 451 S.W.2d 411, 412.)