Opinion
BEDSWORTH, Acting P. J.
This appeal, after a successful demurrer for misjoinder, tests the limits of California’s permissive joinder statute, section 378 of the Code of Civil Procedure.[1] There are no less than 965 plaintiffs *241 listed in the caption of the third amended complaint. Strictly speaking, though, this is a “mass action,” not a “class action.” Had this case been filed prior to 2005, in all probability it would have been filed as a class action. However, in 2005, Congress enacted the Class Action Fairness Act of 2005 (CAFA) codified at 28 United States Code section 1332(d). (See generally Visendi v. Bank of America (9th Cir. 2013) 733 F.3d 863, 866-867 (Visendi).) CAFA allows the removal to federal court of state court class actions when there is a class with 100 or more class members, with at least one class member from a different state than at least one defendant, and there is more than $5 million at stake. (2 Newberg on Class Actions (5th ed. 2012) § 6:14, pp. 542-646.) That is certainly this case — if it had been filed as a class action. And perhaps even if it had not been so pleaded.
We face two questions of state law: First, despite the rather staggering number of joined plaintiffs, does the third amended complaint allege, to track the statutory language of section 378, the “same . . . series of transactions” that will entail litigation of at least one common question of law or fact?[2] Focusing on the language of the statute and the applicable precedent construing it, we conclude it does. Just a few years after section 378’s amendment in 1927, our Supreme Court declared the statute’s same series of transactions language is to be construed broadly in favor of joinder. (Joerger v. Pacific Gas & Electric Co. (1929) 207 Cal. 8, 19 [276 P. 1017].) It has never retreated from that position.
The third amended complaint alleges that in the mid-2000’s, defendant Countrywide Financial Corporation developed a two-pronged business strategy to increase its profits: First, Countrywide would use captive real estate appraisers to provide dishonest appraisals that would inflate home prices beyond levels that would otherwise prevail in an honest market; second, Countrywide would induce its borrowers — these plaintiffs in particular — to take loans Countrywide knew they could not afford by misleading them as to their ability to repay their loans, including misrepresenting key terms of the loans themselves. Countrywide did this because it had no intention of keeping the loans on its books, but intended to bundle them into saleable tranches and sell them to investors.
*242 The 965 plaintiffs are people who borrowed money from Countrywide in the mid-2000’s, to their ultimate chagrin. As we explain below, there are sufficient common questions of law and fact in this case to satisfy section 378, including whether a mortgage lender has a duty to its borrowers not to encourage “high ball,” dishonest appraisals and whether Countrywide really had a deliberate strategy of placing borrowers into loans it “knew” — and the word “knew” is a key part of plaintiffs’ pleading — they could not afford?
It is important to note at the outset that this is a procedural case, so we express no opinion on the legal or factual merits of plaintiffs’ claims vis-a-vis Countrywide’s alleged two-pronged strategy. To draw a parallel to class action certification procedures, permissive joinder is fundamentally a procedural matter where the focus is not on the merits, but on whether there is sufficient commonality to satisfy the requirements of the relevant statute. (See Brinker Restaurant Corp. v. Superior Court (2012) 53 Cal.4th 1004, 1024-1025 [139 Cal.Rptr.3d 315, 273 P.3d 513] (Brinker).)
The applicability of section 378 is the comparatively easy question. Language and precedent dictate the result. The harder question is whether California’s procedures governing permissive joinder are up to the task of managing mass actions like this one. Again, we answer in the affirmative. And again, Brinker provides the relevant template. While we reverse the judgment dismissing all but one plaintiff for misjoinder, we emphasize that on remand the trial court will have to consider a variety of procedural tools with which to organize this case into appropriate and manageable subclaims and subclasses. (Cf. Brinker, supra, 53 Cal.4th at p. 1004 [existence of subclasses made ascertainment of viability of discrete types of wage and hours claims manageable].) While the irony of requiring the case to be divided into “tranches” has not escaped us, we are confident the trial court can handle the task.
I. FACTS
A. The Third Amended Complaint

Form

The operative complaint here is the third amended one, filed June 2012. It is over 14 inches tall. The first page is found on page 5412 of volume 19 of the clerk’s transcript and continues on until the proof of service after the last exhibit on page 8554 of volume 29. Yes, the third amended complaint is 3,142 pages long.
But its organization is more intuitive than that would suggest. The complaint consists of a main narrative body of allegations totaling 208 pages, *243 followed by an appendix A that reads like a series of minicomplaints narrating the (rather similar) loan acquisition experiences of various plaintiffs. Most of those narratives are variations on the same theme: A couple went in for a loan; the amount needed was already an inflated figure because of Countrywide’s prior price fixing of the relevant real estate market. The couple then relied on loan officers at Countrywide to place them in a loan they could afford, but the loan officers hid certain aspects of the loan from them, usually the existence of a balloon payment, sometimes negative amortization, sometimes a change in the terms or calculation of interest rates. And finally, when the Great Recession hit and the local real estate bubble burst decreasing everybody’s home values, these plaintiffs discovered they could not afford their loans, could not afford to refinance, and sustained various kinds of ensuing financial damage.
Appendix A extends 1,771 pages from the end of volume 19 of the reporter’s transcript through the middle of volume 25. Then begin the exhibits. Exhibit A consists of a series of e-mails acquired by plaintiffs, the upshot of which seems to be that there were plenty of people in Countrywide who were expressing misgivings about the firm’s various loan products and loan strategies in the mid-2000’s. Exhibit B consists of a few pages of Countrywide’s own published description of its various loan products. (Exhibit B looks like a sales brochure.) Finally come exhibits C through MMM, which take up the better part of about four volumes of clerk’s transcript, extending a total of 1,106 pages. These appear to be a series of files consisting of form foreclosure documents pertaining to a subset of the plaintiffs — namely 90 or so — who are alleging wrongful foreclosure. These documents mostly include notices of default and notices of sale in individual cases.[3]
B. Content
While the third amended complaint lists six entities as defendants,[4] they are now, essentially, one defendant — Countrywide as absorbed by Bank of America Corporation. That is, all six entities are either directly controlled by Bank of America, which had earlier absorbed Countrywide, or are owned by or affiliated with either Countrywide or Bank of America.[5]
*244 Summarizing the complaint — even the abridged version consisting of just the 208 pages of traditional allegations — presents a challenge. Rhetorical flourishes abound, reminiscent of William Jennings Bryan’s famous Cross of Gold speech from the late 19th century (which come to think of it, was also about banking).[6] The basic narrative has been recounted in several court decisions,[7] but it can, we think, be summarized in just one sentence: Sometime in the mid-2000’s, Countrywide changed the normal game plan of *245 any home mortgage lender from making a profitable loan that is paid back over time to a new game plan by which it would make its profits by originating loans, then branching them (chopping them up into little bits and pieces) and selling them on the secondary market to unsuspecting investors who would themselves assume the risk the borrowers could not repay.[8] At root, everything in the third amended complaint is an elaboration on that theme insofar as it directly affected these plaintiff-borrowers from Countrywide.
In order to make the new game plan work, Countrywide allegedly engaged in an interrelated series of transactions the net effect of which was to saddle plaintiffs with loans they could not afford. This series consisted of two identifiable phases: Phase 1 was to create an otherwise artificial upward spiral of appreciating property values. This upward spiral was allegedly accomplished by Countrywide using its own captive appraisal company, defendant Landsafe, to “falsely” inflate all valuations. The inflated values took on a life of their own, which inflated all property values in California.[9]
*246 Phase 2 was to induce borrowers to take improvident loans. Normally a prudent lender would want to lend to a creditworthy borrower who could pay back the loan at the stated interest rate. But given Countrywide’s new model business plan in which the ultimate payees of the loans were going to be outside investors who would take the hindmost, Countrywide wanted to saddle borrowers with the maximum amount of debt possible — any risk of default would be borne by investors on the secondary market. Meanwhile, Countrywide would pocket loan fees, commissions and profits from the sale of loans after those loans were tranched and securitized. The key to the second prong, i.e., to inducing borrowers into financial improvidence, was to mislead them as to loan terms.
The specific misleading statements allegedly made to these plaintiffs are scattered throughout appendix A, so isolating them all into manageable groups is a chore.[10] Two broad themes, however, can be identified: First, Countrywide loan officers and sales people are alleged to have made broad assurances to each of the plaintiffs that they could “afford” their loans.[11] Second, here and there in appendix A are allegations that loan representatives from Countrywide did not disclose interest rate adjustments or loan terms such as when an initial fixed rate loan suddenly became an adjustable loan.
By the time of the third amended complaint, it had crystallized into four causes of action: intentional misrepresentation, negligent misrepresentation, unfair competition, and wrongful foreclosure. The first three apply to all plaintiffs, the foreclosure claim to only 90 of them. The wrongful foreclosure claim, interestingly enough, presents as pristine a common issue of law as it is possible to imagine: Its theory is that the various individual foreclosures were all unlawful because the eventual trustees who foreclosed on the loan were not the original agents designated in the loan papers. The claim thus presents a tidy, discrete question of law common to all 90 foreclosure plaintiffs.
*247 C. Trial Court Disposition
Defendants demurred to the third amended complaint on the ground of misjoinder of plaintiffs in violation of section 378.[12] The trial court sustained the demurrer without leave to amend and dismissed all the plaintiffs “without prejudice to the rights of the other plaintiffs to file their own complaints,” except for first-named plaintiff, Wright. The judge said: “The Court understands the importance of these claims to the homeowners, but the problem appears to be that they have been improperly joined in a single case based in the way the Third Amended Complaint has been written. While certainly plaintiff Wright is entitled to go forward with his claims, the language of the complaint drafted by his counsel in its fourth version sets forth separate transactions, loan applications and approvals, with many of the loans originating with third parties. Under the controlling law, CCP section 378, there appears to be a misjoinder of the plaintiffs. The claims of the other homeowners can still go forward, but they will have to file their own complaints.”
In January 2013, a judgment of dismissal was entered in favor of defendants against all plaintiffs except for Wright — hence the title of the case before us derives from the second-named plaintiff in the caption, Christina I. Petersen. The dismissal was “without prejudice to the rights of the dismissed Plaintiffs to file their own complaints.” Plaintiffs filed two notices of appeal. They — that is, about 800 of the original 965 — filed a notice of appeal from the judgment of dismissal. It is this appeal with which our opinion is mainly concerned.
But back in the second amended complaint, there had been a cause of action for fraudulent concealment. That fraudulent concealment claim had been dismissed on the merits, pursuant to a demurrer. The order dismissing the fraudulent concealment claim is also the subject of a second appeal. We do not address the substance of this second appeal. Because of our disposition of the appeal from the order dismissing all plaintiffs (but one) for misjoinder, there is no final judgment in this case. Accordingly, we dismiss the appeal from the fraudulent concealment cause of action because it would violate the one final judgment rule for us to consider its merits in this proceeding. (See Kurwa v. Kislinger (2013) 57 Cal.4th 1097, 1107 [162 Cal.Rptr.3d 516, 309 P.3d 838] [noting policy against piecemeal appeals]; Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 741, fn. 9 [29 Cal.Rptr.2d 804, 872 P.2d 143] [same].) Rather, our focus is on the permissive joinder of such a large number of plaintiffs in this “mass action.”
*248 II. DISCUSSION
A. Permissive Joinder Under Section 378
California procedural law is infused with a solicitude, if not an altogether outright preference, for the economies of scale achieved by consolidating related cases into a single, centrally managed proceeding. Class actions themselves, as set forth in section 382, constitute the most obvious example, since they allow the adjudication of common issues of liability based on the aggregation of claims in one proceeding, usually in a context where adjudicating those claims piecemeal would be impracticable. (See Vasquez v. Superior Court (1971) 4 Cal.3d 800, 816 [94 Cal.Rptr. 796, 484 P.2d 964]; accord, City of San Jose v. Superior Court (1974) 12 Cal.3d 447, 457 [115 Cal.Rptr. 797, 525 P.2d 701] [observing a “recognized policy favoring” “appropriate class actions”].)
The affinity for economies of scale manifests itself in a number of other procedural contexts. These include the statutory preference in criminal law that favors consolidation of charges against multiple defendants where there is cross-admissibility[13] and rules of court requiring designation of related cases to avoid “substantial duplication of judicial resources if heard by different judges.”[14] It even shows up in the common law doctrine of res judicata and the appellate doctrine of the one final judgment rule.[15]
It is also manifested by the statutory provision before us now — the one that allows for permissive joinder in section 378. An important aspect of the Legislature’s drafting of the statute should not go unremarked: While many procedural statutes commit discretion to the trial judge, this statute commits discretion to the plaintiffs ... to the plaintiffs themselves. If there is a right to relief arising out of the same series of transactions, it is the plaintiffs who get to decide whether to join together in a common action. Consider the syntax of the opening to section 378 the way the Legislature wrote it: “All persons may join in one action as plaintiffs if: [(J[] (1) They assert any right to relief jointly . . . .” (Italics added.) It is the plaintiffs who make the initial decision to file jointly.
*249 In this case, the key words on which that choice turns are “same . . . series of transactions.” As far back as the late 1920’s, in the immediate wake of the 1927 amendment of section 378, our Supreme Court noted that the permissive joinder statute reflected the Legislature’s desire that joinder be liberally construed so as to prevent the diseconomy of a “multiplicity” of cases. Said the court in Joerger v. Pacific Gas & Electric Co., supra, 207 Cal. at pages 19-20: “One of the objects of the reformed or code procedure is to simplify the pleadings and conduct of actions, and to permit the settlement of all matters of controversy between parties in one action, so far as may be practicable. ... To permit a joinder where possible makes manifestly for the expeditious disposition of litigation without working hardship to any party defendant, and for this reason statutes relating to joinder should be liberally construed, unless expressly forbidden, to the end that a multiplicity of suits may be prevented.” (Italics added.)
The high court expressed similar sentiments — again, relatively soon after the statute’s amendment — in Kraft v. Smith (1944) 24 Cal.2d 124, 129 [148 P.2d 23]. So did the Court of Appeal. (See Busset v. California Builders Co. (1932) 123 Cal.App. 657, 666 [12 P.2d 36] [noting joinder statures “should be liberally construed in furtherance of administrative efficiency”]; Morris v. Duncan (1936) 14 Cal.App.2d 635, 639 [58 P.2d 669]; accord, Coleman v. Twin Coast Newspaper, Inc. (1959) 175 Cal.App.2d 650, 653 [346 P.2d 488] [the joinder statute “should be liberally construed so as to permit joinder whenever possible in furtherance of [its] purpose”].) The Rutter Group treatise on civil procedure before trial has accordingly drawn the obvious conclusion: “The requirement that the right to relief arise from the ‘same transaction or series of transactions’ is construed broadly. It is sufficient if there is any factual relationship between the claims joined (and this tends to merge with the ‘common question’ requirement, below).” (Well & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2014) f 2:211, p. 2-60.1, some italics added (hereinafter Rutter California Civil Procedure Treatise).)
Section 378 is based on rule 20 of the Federal Rules of Civil Procedure (28 U.S.C.) (see Rodriguez v. Bethlehem Steel Corp. (1974) 12 Cal.3d 382, 407, fn. 28 [115 Cal.Rptr. 765, 525 P.2d 669]), and the federal rule has been interpreted to include the same adjuration to liberal application: “Requirements liberally construed: The requirements governing permissive joinder are construed liberally in order to promote trial convenience and to expedite final determination of disputes: ‘Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.’ ” (Schwarzer et al., Cal. Practice Guide: Federal Civil Procedure Before Trial *250 (The Rutter Group 2014) f 7:138, p. 7-57 (rev. # 1, 2014), boldface omitted, quoting Mine Workers v. Gibbs (1966) 383 U.S. 715, 724 [16 L.Ed.2d 218, 86 S.Ct. 1130].)
Broad construction of section 378 has been exemplified in a series of appellate decisions over the years. The most instructive is Anaya v. Superior Court (1984) 160 Cal.App.3d 228 [206 Cal.Rptr. 520]. There, multiple joinder was upheld in a case involving widespread exposure to hazardous chemicals. Anaya allowed the joinder of 200 plaintiffs on the basis that exposure to a harmful chemical involved “the same series of transactions” even though the plaintiffs were exposed at different times and in different ways. (Id. at p. 233.) In Anaya there were — as in the case at hand — lots of differences in the individual damages sustained by the plaintiffs from the defendants’ conduct. But the Anaya court pointed out that the key question was the existence of “common questions of law and fact,” and not whether, as the defendants had emphasized, there were “differences in the evidence to be presented and in the legal theories to be used by the various plaintiffs.” (Ibid.) The “point” of section 378, said the court, is to allow joinder where “ ‘any question of law or fact common to all’ plaintiffs will arise.” (160 Cal.App.3d at p. 233.) And Anaya thought “any” means “any.” The word was emphasized by the court. (Ibid.)
Broad construction was also the watchword in State Farm Fire & Casualty Co. v. Superior Court (1996) 45 Cal.App.4th 1093, 1113 [53 Cal.Rptr.2d 229].[16] In State Farm, multiple joinder was allowed in Northridge earthquake litigation because there was an allegedly fraudulent “systematic” practice of deceiving policyholders. (45 Cal.App.4th at p. 1113.) State Farm allowed the joinder of 165 Northridge earthquake claimants who asserted that they were the victims of a clever insurance policy switch: Their earthquake endorsements to all-risk policies had been replaced with a separate earthquake policy not tethered to the all-risk policy, resulting in lower total coverage. (45 Cal.App.4th at p. 1099.)
Significantly for our purposes, the plaintiffs in State Farm further alleged that after the earthquake they suffered “some 15 different types of ‘improper claims handling processes’ ” which were “ ‘systematically, methodically and generally’ ” implemented by the insurer. (State Farm Fire & Casualty Co. v. Superior Court, supra, 45 Cal.App.4th at pp. 1099-1100.) The diversity of *251 those claims, however, did not prevent joinder, even though they necessarily entailed individualized facts analogous to the individual loan transactions before us now.
In some ways State Farm applies a fortiori to certain of the allegations before us now. While there might be a plethora of ways to “low ball” property insurance claims, there are comparatively few ways to “high ball” appraisals — basically, as the third amended complaint alleges, you can simply use noncomparable properties as comparables, or rely on previously made dishonest appraisals of comparables. And, while bad faith insurance adjustment involves a variety of small tricks and subjective negotiating pressures, here the ways in which defendants allegedly misled borrowers constitute a discrete set of only a few items — mainly unexpected balloon payments and switches from fixed to adjustable rates. If the joinder of a wide variety of claims handling practices was appropriate under State Farm, the joinder of various forms of loan impropriety here seems equally correct.
A further manifestation of the broad construction required under section 378 is found in Moe v. Anderson (2012) 207 Cal.App.4th 826 [143 Cal.Rptr.3d 841]. In Moe, two patients alleged they were victims of separate sexual assaults allegedly committed by a physician. To be sure, joinder was not appropriate as to the physician, since the assaults involved “separate and distinct” events “during separate and distinct time periods.” (Id. at p. 833.) But the claims against the medical group for which the physician worked was a different story. Joinder was appropriate as to the single employer since the same basic issue of negligent supervision and hiring was common to both (otherwise disparate) plaintiffs, and would involve the same evidence against a single defendant. The court said: “Thus, as was the case in Anaya, plaintiffs have asserted a right to relief arising out of the same series of transactions. So too are there common issues of law or fact. The same evidence with respect to Healthworks’s hiring and supervision of Anderson will need to be adduced in separate lawsuits if joinder is not allowed.” (Id. at p. 836, italics added.) Needless to say, in the case before us there is much in the way of common evidence and theories of liability and much of the same evidence will have to be repeatedly produced if joinder is not allowed. Indeed, we shudder to think of the duplication of effort if even a dozen of the 800 or so plaintiffs who have brought this appeal have individual trials on liability issues.
Finally, Adams v. Albany (1954) 124 Cal.App.2d 639 [269 P.2d 142] is similarly instructive. There, joinder of no less than 40 sets of home buyers (recent war veterans) was held proper. Even though the defendant argued its allegedly fraudulent scheme involved torts that took place at different times and places, and even though the evidence as to one house would have no probative value as to any other house, the appellate court invoked the “series *252 of transactions” language from section 378 and said it was enough that defendant was alleged to have engaged in a conspiracy to defraud the veterans by selling them substandard housing. As here, Adams is a case where the alleged “business plan” of the defendant was common to multiple defendants, even if their specific damages might vary.
In light of State Farm, Anaya, Moe and Adams, it would be a major departure from California case law construing section 378 for us to uphold the trial court’s demurrer for misjoinder in this case. This case is merely a quantitatively — not qualitatively — larger version of those four, particularly State Farm and Adams.
Here, we have already identified the two core aspects of the common plan alleged in the third amended complaint that necessarily will entail common evidence (1) whether Countrywide deliberately encouraged dishonest appraisals and (2) whether Countrywide encouraged its loan officers to conceal loan terms. These two aspects devolve into several questions of law or fact bearing on liability. Here are four that come readily to mind: (a) whether Countrywide had a conscious business plan to pressure or otherwise unduly influence appraisers to dishonestly inflate appraisals; (b) if it did, whether even such dishonest appraisals could have the cumulative effect of inflating real estate markets in a way that might have caused buyers and/or borrowers in those markets to pay more, or borrow more, than they otherwise might have; (c) even if they did, whether such marginally extra borrowed money constitutes cognizable damages under some theory of law; and (d) whether a failure to expressly warn buyers or borrowers about such key terms of a written loan agreement, such as changes from fixed to adjustable rates, or the need to make a balloon payment at the end are actionable under some theory of fraud or unfair business practice.
We emphasize again that this case involves essentially only one lender, Countrywide, operating in conjunction with its captive appraisal agents. While Countrywide cites a number of federal cases that concluded there had been misjoinder, these federal cases merely make the point that genuinely multiple defendants do not fall within the federal permissive joinder rule.[17]
We further emphasize that our conclusion joinder is permissible is based on commonality regarding liability, not damages. There is a direct *253 parallel here (again) to class actions. While the individual damages among these 965 plaintiffs of course vary widely, that is not the salient point. (See Brinker, supra, 53 Cal.4th at p. 1022 [“ ‘As a general rule if the defendant’s liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.’ [Citations.]”].) The salient point is that liability is amenable to mass action treatment.
Finally, we must observe that two overall policies of the law are served by joinder in this instance. One is access to justice. To require these plaintiffs to file separately not only clogs up the courts, but also deprives them of economies of scale otherwise available under section 378, particularly in regard to the clearly common proof bearing on Countrywide’s alleged two-pronged scheme to both fix prices and mislead borrowers as to loan terms. As far as we can tell, the same experts and whistleblowers will be common to all causes of action based on variations of misrepresentation or unfair competition.
The second is the conservation of judicial resources. There is an obvious burden to the trial court if joinder is not allowed. Appendix A shows that there are some 800 or so potential individual actions out there (assuming that the 165 of the original 965 plaintiffs who did not join this appeal no longer care), waiting to come trooping in as single snipers, not as one readymade, manageable battalion. It would not take many such actions before the trial court would be faced with the administrivial task of setting up a grand coordinated action, which in all probability — because it will involve different plaintiffs and different actions — will be harder to manage than this one, single action. (Cf. § 404 [authorizing coordination]; Stats. 1992, ch. 696, § 1(b)(1)(C), pp. 3002-3003 [“The Legislature further finds and declares that: [(][] • ■ • [][] ■ • • Scarce judicial resources must be used in an efficient manner . . . .”].)[18] Put another way, mass joinder here holds the promise of *254 actually decreasing trial court case management time. Unless we adopt the cynical view that requiring each plaintiff to proceed against the corporate defendants will make their cases go away, we have to consider this aspect of the case.
B. Management
And in regard to administrative tasks ahead, we must offer what we can in the way of guidance for the trial court on remand. We say “we must” because we believe sending this 3,000-plus-page third amended complaint case back to the trial court without guidance would be nothing less than oppressive. If we are going to send Moby Dick back to the trial court, we should at least provide a harpoon or two. Countrywide’s argument that the sheer heft of this 965-plaintiff action is unduly burdensome does carry some force. But we think the law of California procedure strikes a golden mean here. On the one hand, it is unfair to these plaintiffs to deprive them of the commonalities of proof and witnesses inherent in their basic theory against Countrywide. As noted, the same experts and whistleblowers can be anticipated to provide evidence for all these plaintiffs. On the other hand, it is unfair to Countrywide to saddle it with the amorphous, inchoate heap of allegations that currently constitutes the third amended complaint as drafted and structured. So let us be plain: On remand the trial court will have the power to require plaintiffs’ counsel to whip the third amended complaint’s desultory and scattered allegations against Countrywide into a tightly structured set of manageable subclaims and subclasses. Our decision does not require it to commence jury selection at Anaheim Stadium.[19]
Injustice, said Aristotle, can consist in treating unequals equally or of treating equals unequally. So, just as there is a procedural solicitude for consolidation to assure access to justice that favors joinder and class actions, there is corresponding contrapuntal recognition in procedural law that trial courts sometimes need to categorize and subdivide claims and classes to treat them effectively. We find it in such procedures as the discretion of trial courts to sever arbitral claims from nonarbitral ones (e.g., Doan v. State Farm General Ins. Co. (2011) 195 Cal.App.4th 1082, 1098-1099 [125 Cal.Rptr.3d 793]), the authority to order separate trials in order to avoid prejudice (§ 1048) and — important for our purpose here — the ability to organize class actions into appropriate subclasses. (See generally Brinker, supra, 53 Cal.4th 1004 [use of subclasses allowed court to ascertain validity of some claims *255 and invalidity of others]; Aguiar v. Cintas Corp. No. 2 (2006) 144 Cal.App.4th 121, 125 [50 Cal.Rptr.3d 135] [“Because the complexities of the case on which the trial court relied to find class certification inappropriate can be addressed by the use of subclasses ... we reverse the order denying certification and remand the matter with directions for the trial court to certify two subclasses of Cintas employees . . . .”]; Canon U.S.A., Inc. v. Superior Court (1998) 68 Cal.App.4th 1, 5 [79 Cal.Rptr.2d 897] [noting obligation of trial court to consider possible creation of subclasses in context of class certification].)
The trial court has the authority to require the various classes and claims found in the third amended complaint be properly and digestibly organized. This is easily a “complex” action under rule 3.400(c)(5) [claims involving mass torts] of the California Rules of Court. As such, judicial administration standards contemplate the designation of one judge who will have the power to identify phases for the litigation and set time limits on those phases, and adjudicate legal and evidentiary subissues pretrial.[20]
As stated earlier, today’s decision is also without prejudice as to whether CAFA applies. (Cf. Bullard v. Burlington Northern Santa Fe Railway Co. (7th Cir. 2008) 535 F.3d 759 [CAFA removal upheld]; Koral v. Boeing Co. (7th Cir. 2011) 628 F.3d 945, 947 [CAFA removal premature, but noting “a mass action is a form of class action”]; Romo v. Teva Pharmaceuticals USA, Inc. (9th Cir. 2013) 731 F.3d 918, 924 [no CAFA removal of state court coordinated proceedings because of absence of proposal for joint trial].) Likewise, it is without prejudice to either side to bring a class certification motion. (See Cal. Rules of Court, rule 3.764(a)(1) [any party may move to certify a class].)
Finally, because we remand the case back to the trial court, there is, as yet, no final judgment, so we are dismissing the appeal from the order dismissing the cause of action for fraudulent concealment. Obviously we express no opinion on the merits of that cause of action now.
*256 III. DISPOSITION
The judgment dismissing those plaintiffs who have filed notices of appeal in this action is reversed, and the case remanded with directions to conduct further proceedings not inconsistent with this opinion. Because this is an interlocutory appeal without final disposition of the cause, we do not award appellate costs now. Rather, we authorize the trial judge, at the conclusion of proceedings, to award the appellate costs of this appeal as he or she believes serve the interests of justice.
Thompson, J., concurred.

 All undesignated statutory references in this opinion are to the Code of Civil Procedure.

 Here is the complete text of section 378:
“(a) All persons may join in one action as plaintiffs if:
“(1) They assert any right to relief jointly, severally, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action; or “(2) They have a claim, right, or interest adverse to the defendant in the property or controversy which is the subject of the action.
“(b) It is not necessary that each plaintiff be interested as to every cause of action or as to all relief prayed for. Judgment may be given for one or more of the plaintiffs according to their respective right to relief.”

 The exception is exhibit Q, which, for some reason, was left blank for future use.

 Bank of America, N.A., Countrywide Financial Corporation and Countrywide Home Loans (Countrywide), ReconTrust Company, N.A., CTC Real Estate Services and Landsafe, Inc. (Landsafe).

 Bank of America took over Countrywide at the beginning of the Great Recession. (See generally Note, Banktown: Assessing Blame for the Near-Collapse of Charlotte’s Biggest Banks (2011) 15 N.C. Banking Inst. 423.) The acquisition has been a headache ever since. (See id. at p. 453 [“The Countrywide Financial acquisition has subjected Bank of America to large penalties and litigation costs.”].)

In this opinion we mostly refer to Countrywide as the defendant because, in substance, this complaint primarily targets Countrywide’s loan and appraisal practices back in the mid-2000’s.
6 The famous speech even made a specific reference to a “banking conspiracy.” In that vein, the third amended complaint includes such exuberant allegations as:
“With greed as their motive, Defendants set out upon a massive and centrally directed fraud by which Defendants placed homeowners into loans which Defendants knew Plaintiffs could not afford, abandoned industry standard underwriting guidelines, and intentionally inflated the appraisal value of homes throughout California for the sole purpose of herding as many borrowers as they could into the largest loans possible which Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten profit (wildly surpassing the profit they would make by holding the loans), knowing that their scheme would cause the precipitous decline in values of all homes throughout California, including those of Plaintiffs herein.”
“Like cattle, Plaintiff-borrowers were led to the slaughter by Defendants and their greed.”
“Where, as here, corporate greed exceeds the extant and imperative public need for informed disclosure, the law must not sanction.”

 See Visendi, supra, 733 F.3d 863, 866 (“Plaintiffs alleged, among other things, that the institutions’ deceptive mortgage lending and securitization practices decreased the value of their homes, impaired their credit scores, and compromised their privacy.”); Graham v. Bank of America, N.A. (2014) 226 Cal.App.4th 594, 599-600 [172 Cal.Rptr.3d 218] (“Taking issue with industrywide mortgage banking practices, Graham seeks to hold defendants responsible for the decline in his property value as well as the collapse of the real estate market.”).
Perhaps the most succinct statement by a published California court opinion of Countrywide’s role in the Great Recession can be found in Bank of America Corp. v. Superior Court (2011) 198 Cal.App.4th 862, 865 [130 Cal.Rptr.3d 504] (Bank of America 2011): “By 2005, Countrywide was the largest mortgage lender in the United States, originating over $490 billion in loans in that year alone. Countrywide’s founder and CEO, Angelo Mozilo determined that Countrywide could not sustain its business ‘unless it used its size and large market share in California to systematically create false and inflated property appraisals throughout California. Countrywide then used these false property valuations to induce Plaintiffs and other borrowers into ever-larger loans on increasingly risky terms.’ Mozilo knew ‘these loans were unsustainable for Countrywide and the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other Countrywide borrowers.’ [¶] Mozilo and others at Countrywide ‘hatched a plan to “pool” the foregoing mortgages and sell the pools for inflated value. Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values ... in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale.’ ”
In the case before us, the third amended complaint largely echoes the allegations made in Bank of America 2011, except the style is bit more rococo.

 Why were investors willing to part with their money so easily? Basically, the answer is investors felt confident that “the risk” had been prudently dispersed. Our colleagues in the Fifth District have provided this helpful description of the process: “In simplified terms, ‘securitization’ is the process where (1) many loans are bundled together and transferred to a passive entity, such as a trust, and (2) the trust holds the loans and issues investment securities that are repaid from the mortgage payments made on the loans. [Citation.] Hence, the securities issued by the trust are ‘mortgage-backed. ’ ” (Glaski v. Bank of America (2013) 218 Cal.App.4th 1079, 1082, fn. 1 [160 Cal.Rptr.3d 449]; see Akopyan v. Wells Fargo Home Mortgage, Inc. (2013) 215 Cal.App.4th 120, 142 [155 Cal.Rptr.3d 245] [noting that because of securitization, “ ‘thinly capitalized mortgage bankers and finance companies’ ” were able to “ ‘originate loans for sale on the secondary market.’ ”]; Engel & McCoy, A Tale of Three Markets: The Law and Economics of Predatory Lending (May 2002) 80 Tex. L.Rev. 1255, 1275 [quoted by Akopyan].)
Back to the third amended complaint. In addition to the — as it turned out, flawed — risk-spreading theory of securitization, the document alleges investors thought they had insurance for loan defaults by using “credit default swaps,” which are forms of insurance against loan defaults. Paragraphs 142 through 146 of the third amended complaint constitute a philippic against credit default swaps. (E.g., par. 146 a., “Nobel prize-winning economist George Akerlof predicted that CDS would cause the next meltdown . . . .”)

 Paragraph 98 of the third amended complaint encapsulates this allegation: “98. At Countrywide and Defendants’ behest, and at their direction, Landsafe Appraisals began systematically inflating the valuations they rendered upon the subject properties of each loan, including the loans of Plaintiffs herein. As is common knowledge in the real estate industry, appraisers are required to calculate the value of a home based almost entirely on the value of other nearby homes (called comparables aka ‘comps’). Defendants, including Countrywide and Bank of America seized on this vulnerability in the system. Exercising dominion over Landsafe, Countrywide directed Landsafe to begin systematically inflating the valuations they rendered upon the subject properties of each of their loans (including loans of Plaintiffs herein), knowing that by doing so their falsely inflated valuations would act as comps upon which numerous other appraisers based their valuations of other homes. LandSafe’s and Defendants’ inflated appraisals caused other homes to be valued for more than they were *246 worth, which in turn acted as the predicate for even high appraisals, and which, in turn, caused even more homes to be valued for more than they were worth. The result was a vicious self-feeding exponential cycle, both expected and intended by Defendants; the result was the intentional, systematic, artificial inflation of home values throughout California.” (Italics omitted.)

 As we stress in part U.B. of this opinion, the trial court will have the power on remand to require plaintiffs’ counsel to undertake that chore in the first instance.

 In that regard there are ironic allegations of fraudulent conduct inuring to the ostensible benefit of some plaintiffs, who are alleged to have only qualified for their loans because, unbeknownst to them, Countrywide fraudulently overstated their income by physically altering their loan applications. On remand the trial court will have the power to require plaintiffs’ counsel to specifically identify all plaintiffs who fall into this subset.

 Defendants have filed a motion to augment the record with their memorandum of points and authorities in support of this demurrer, filed on October 5, 2012. The motion is granted. (Cal. Rules of Court, rule 8.155(a).)

 See Penal Code section 954; see generally People v. Manriquez (2005) 37 Cal.4th 547, 574 [36 Cal.Rptr.3d 340, 123 P.3d 614] (discussing severance and joinder of charges).

 California Rules of Court, rule 3.300(a)(4)).

 A point nicely made by Judge Posner in Arrow Gear Co. v. Downers Grove Sanitary Dist. (7th Cir. 2010) 629 F.3d 633, 638: “The doctrine of res judicata serves institutional as well as private interests — interests similar to those served by forbidding piecemeal appeals. Both res judicata and the final-judgment rule, along with a number of other procedural rules, aim at forcing closely related claims to be consolidated in a single proceeding, whether original or appellate, in order to economize on the expenditure of judicial resources for which litigants don’t pay.”

 In the course of its decision, the State Farm panel attempted a definition of unfair competition that the Supreme Court later said was “too amorphous” to provide “guidance to courts and businesses.” (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 185 [83 Cal.Rptr.2d 548, 973 P.2d 527].) What State Farm held about joinder remains, to use the old phrase from the days of Shepardizing, “good law.”

 (Visendi, supra, 733 F.3d at p. 866 [misjoinder where 137 plaintiffs sued 25 financial institutions]; Barber v. America’s Wholesale Lender (M.D.Fla. 2013) 289 F.R.D. 364, 365 [misjoinder where 18 different borrowers sued at least nine different lenders]; Abraham v. American Home Mortgage Servicing (E.D.N.Y. 2013) 947 F.Supp.2d 222, 228-229 [misjoinder where several hundred current and former homeowners sued several dozen mortgage originators and servicers].)

 There is a doctrinal interrelatedness in the issues of judicial economy and coordination that can cut in two directions at once. Section 404 is part of the general solicitude in California procedural law — also reflected in section 378, our state’s permissive joinder statute — that seeks the benefit of the economies of scale from the joint adjudication of common questions of law or fact. (See § 404.1 [referencing convenience and “efficient utilization of judicial facilities and manpower” of coordination of actions involving common questions of law or fact].) But this solicitude has its twists: Recently, in Corber v. Xanodyne Pharmaceuticals, Inc. (9th Cir. 2014) 771 F.3d 1218, the Ninth Circuit, in an en banc decision, equated requests for coordination by plaintiffs of more than 40 state court actions involving an allegedly defective drug as the equivalent of a request for joint trials, which subjected those actions to removal under CAFA. It is an interesting question, given the overlap in “common question” standards that govern both permissive joinder and coordination in California, whether it will be even possible for the plaintiffs in this case to avoid removal under CAFA. To put it plainly: Is filing an action so large that it is unmanageable without coordination the de facto equivalent of a request the cases be tried jointly a la Corberl That is a question we will leave to the federal courts to sort out.

 Consider, for example, two basic tools of early case civil procedure that are useful in transforming otherwise amorphous, sprawling pleadings into tight, manageable sets of claims: The special demurrer for uncertainty (§ 430.10, subd. (f)) and the motion to strike irrelevant, false or improper matter (§ 436). In this case it will obviously be a while before this complaint is ready for the prime time of a trial.

 We have tried here to give a little help in that regard but we do not flatter ourselves that we have done more than carry some wood to the carpenter. (See generally Rutherford v. Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 966 [67 Cal.Rptr.2d 16, 941 P.2d 1203]; Lu v. Superior Court (1997) 55 Cal.App.4th 1264 [64 Cal.Rptr.2d 561] [approving discovery referee for complex construction defect litigation]; Lucas v. County of Los Angeles (1996) 47 Cal.App.4th 277, 284-285 [54 Cal.Rptr.2d 655] [“A court has inherent equity, supervisory and administrative powers, as well as inherent power to control litigation and conserve judicial resources. . . . Courts can conduct hearings and formulate rules of procedure where justice so demands.” (citation omitted)]; § 187 [“if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code”]; Cal. Stds. Jud. Admin., § 3.10; Rutter Cal. Civil Procedure Treatise, supra, ][ 12:47, pp. 12(1)-14 to 12(1)-14.1 (rev. # 1, 2014).)